**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**
**HAMMOND DIVISION**

| | | |
|---|---|---|
| JOY DEGANI, M.D. and | ) | |
| DANIEL LEVINTHAL, M.D., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | CAUSE NO.: 2:04-CV-398-PRC |
| | ) | |
| THE COMMUNITY HOSPITAL, | ) | |
| | ) | |
| Defendant. | ) | |

**OPINION AND ORDER**

This matter is before the Court on (1) Plaintiffs' Motion for Partial Summary Judgment [DE 63], filed by the Plaintiffs, Joy Degani, M.D. and Daniel Levinthal, M.D. ("Doctors"), on April 20, 2005, and (2) Defendant Community Hospital's Motion for Summary Judgment [DE 65], filed by the Defendant, The Community Hospital ("Hospital"), on April 20, 2005. For the following reasons, the Court grants the Defendant's Motion for Summary Judgment and denies the Plaintiffs' Motion for Partial Summary Judgment.

**PROCEDURAL BACKGROUND**

On September 27, 2004, the Doctors filed a Complaint, alleging that the Hospital breached the Agreement for Anesthesia Services ("Agreement") entered into between each of the Doctors and the Hospital. The Doctors demanded a trial by jury on October 1, 2004.

On October 6, 2004, the Hospital filed its Answer and an Emergency Motion for Temporary Restraining Order and Preliminary Injunction. On October 7, 2004, District Court Judge Rudy

Lozano entered an Order denying the Hospital's Motion for Temporary Restraining Order and Preliminary Injunction.

On November 1, 2004, the parties consented to have this case assigned to a United States Magistrate Judge to conduct all further proceedings and to order the entry of a final judgment in this case. Thus, this Court has jurisdiction to decide this case pursuant to 28 U.S.C. § 636(c).

On November 29, 2004, the Hospital filed a Motion for Leave to File its First Amended Verified Counter-Claim and a Motion for Preliminary Injunction and Evidentiary Hearing. On December 1, 2004, the Court granted the Hospital's Motion for Leave to File the First Amended Verified Counter-Claim. The First Amended Verified Counter-Claim was filed by the Hospital the same day. On December 1, 2004, the Court also entered an Order granting the Hospital's Motion for Evidentiary Hearing and taking under advisement the Motion for Preliminary Injunction. The Court held a hearing on the Motion for Preliminary Injunction on December 15 and 17, 2004. On December 29, 2004, the Court entered an Order denying the Hospital's Motion for Preliminary Injunction.

On April 20, 2005, the Doctors filed a Motion for Partial Summary Judgment and the Hospital filed a Motion for Summary Judgment, a Statement of Designation of Materials, and a Statement of Material Facts. On April 21, 2005, the Hospital filed Exhibits 1-11 to its Designation of Materials in Support of Motion for Summary Judgment.

On May 23, 2005, the Doctors filed their Response in Opposition to the Hospital's Motion for Summary Judgment, and the Hospital filed its Response in Opposition to Doctors' Motion for Partial Summary Judgment. On June 8, 2005, the Doctors and the Hospital filed their respective

Reply Briefs.  On July 14, 2005 the Hospital filed a Motion for Leave to File Additional Authority,

which the Court granted on July 28, 2005.

## SUMMARY JUDGMENT STANDARD[1]

The Federal Rules of Civil Procedure mandate that motions for summary judgment be

granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together

with the affidavits, if any, show that there is no genuine issue as to any material fact and that the

moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).[2]  Rule 56(c) further

requires the entry of summary judgment, after adequate time for discovery, against a party "who

fails to make a showing sufficient to establish the existence of an element essential to that party's

case, and on which that party will bear the burden of proof at trial."  *Celotex Corp. v. Catrett*, 477

U.S. 317, 322 (1986).  "[S]ummary judgment is appropriate–in fact, is mandated–where there are

---

[1] The parties have agreed that the record for the purposes of these motions shall consist of the evidence elicited and the orders entered as a result of the preliminary injunction hearing conducted on December 15, 2004, and December 17, 2004.

[2] Neither party included the federal standard for ruling on a motion for summary judgment.  The Doctors stated simply that they moved for partial summary judgment "pursuant and in accordance with Rule 56" of the Federal Rules of Civil Procedure but did not provide any summary judgment language or standard.  In contrast, the Hospital included the Indiana *state* law standard for summary judgment in its response brief.

    The standard for summary judgment in federal court is governed by federal, not state, law.  *See Mayer v. Gary Partners and Co., Ltd.*, 29 F.3d 330, 334 (7th Cir. 1994) (holding that the federal standard applies to a ruling on summary judgment) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249-51 (1986); *McEwen v. Delta Air Lines, Inc.*, 919 F.2d 58, 60 (7th Cir. 1990)); *see also Cole v. Gohmann*, 727 N.E.2d 1111, 1114 (Ind. Ct. App. 2000) ("Indiana does not adhere to *Celotex* and the federal methodology.") (citing *Jarboe v. Landmark Cmty. Newspapers*, 644 N.E.2d 118, 123 (Ind. 1994)).

    Under the Indiana standard for summary judgment, the moving party must demonstrate the absence of any genuine issue of fact as to a determinative issue; only then must the non-movant come forward with contrary evidence.  *See Cole*, 727 N.E.2d at 1114.  In contrast, under the federal standard, the moving party is not required to negate an opponent's claim; rather "the movant need only inform the court of the basis of the motion and identify relevant portions of the record 'which it believes demonstrate the absence of a genuine issue of material fact,'" and the "burden then rests upon the nonmoving party to make a showing sufficient to establish the existence of each challenged element upon which the non-movant has the burden of proof."  *Id.* (quoting *Celotex*, 477 U.S. at 323).

no disputed issues of material fact and the movant must prevail as a matter of law.  In other words, the record must reveal that no reasonable jury could find for the non-moving party." *Dempsey v. Atchison, Topeka, & Santa Fe Ry. Co.*, 16 F.3d 832, 836 (7th Cir. 1994) (citations and quotation marks omitted).

A party seeking summary judgment bears the initial responsibility of informing a court of the basis for its motion and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323.  The moving party may discharge its "initial responsibility" by simply "'showing'–that is, pointing out to the district court–that there is an absence of evidence to support the non-moving party's case." *Id.* at 325.  When the non-moving party would have the burden of proof at trial, the moving party is not required to support its motion with affidavits or other similar materials negating the opponent's claim. *Id.* at 323, 325; *Green v. Whiteco Indus., Inc.*, 17 F.3d 199, 201 n.3 (7th Cir. 1994); *Fitzpatrick v. Catholic Bishop of Chicago*, 916 F.2d 1254, 1256 (7th Cir. 1990).  However, the moving party, if it chooses, may support its motion for summary judgment with affidavits or other materials and thereby shift to the non-moving party the burden of showing that an issue of material fact exists. *Kaszuk v. Bakery & Confectionery Union & Indus. Int'l Pension Fund*, 791 F.2d 548, 558 (7th Cir. 1986); *Bowers v. DeVito*, 686 F.2d 616, 617 (7th Cir. 1982).

Once a properly supported motion for summary judgment is made, the non-moving party cannot resist the motion and withstand summary judgment by merely resting on its pleadings.  Fed. R. Civ. P. 56(e); *Donovan v. City of Milwaukee*, 17 F.3d 944, 947 (7th Cir. 1994).  Rule 56(e) establishes that "the adverse party's response, by affidavits or as otherwise provided in this rule,

must set forth specific facts showing that there is a genuine issue for trial." *See also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-50 (1986). Thus, to demonstrate a genuine issue of fact, the non-moving party must do more than raise some metaphysical doubt as to the material facts; the non-moving party must come forward with specific facts showing that there is a genuine issue for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).

In viewing the facts presented on a motion for summary judgment, a court must construe all facts in a light most favorable to the non-moving party and draw all legitimate inferences in favor of that party. *NLFC, Inc. v. Devcom Mid-Am., Inc.*, 45 F.3d 231, 234 (7th Cir. 1995); *Doe v. R.R. Donnelley & Sons Co.*, 42 F.3d 439, 443 (7th Cir. 1994). A court's role is not to evaluate the weight of the evidence, to judge the credibility of witnesses, or to determine the truth of the matter, but instead to determine whether there is a genuine issue of triable fact. *Anderson*, 477 U.S. at 249-50; *Doe*, 42 F.3d at 443. When considering cross-motions for summary judgment, "our review of the record requires that we construe all inferences in favor of the party against whom the motion under consideration is made." *Allen v. City of Chicago*, 351 F.3d 306, 311 (7th Cir. 2003) (citations and internal quotation marks omitted).

## FACTUAL BACKGROUND

On June 1, 2000, the Hospital and Dr. Degani entered into an Agreement for Anesthesia Services ("Agreement") for Dr. Degani to provide anesthesiologist services for the Hospital, and on November 10, 2000, the Hospital and Dr. Levinthal entered into an identical Agreement for the purposes of this Order.

Paragraph 1.1 of the Agreement provides that the Doctors "shall provide Anesthesia Services and other service as specified in Exhibit 1.1(A) attached hereto and hereby incorporated herein." Def. Mot., Exh. 1 & 2, p. 2.  The Doctors' "Job Description," as found in Exhibit 1.1(A) to the Agreement, provides, in relevant part:

> The Physician will engage in the practice of anesthesia medicine for patients of the Hospital located in Munster, Indiana.  The Physician shall perform the following professional and administrative services:
>
> Professional Services of Physician. . . . .
> 1.     Deliver anesthesia services to all patients requiring anesthesia or pain management services at the Hospital.
>        . . . .
> 4.     Supervise anesthesia services to Patients by providing medical direction to nurse anesthetists and other Hospital employees that may be providing direct Patient care.

Id. at Exhibit 1.1(A).  At the preliminary injunction hearing, Dr. Degani testified that she was not allowed to provide services directly to patients while she was supervising CRNAs and that she was permitted to supervise up to four CRNAs at a time.  "Anesthesia services" is defined in Paragraph 1.2 of the Agreement:

> 1.2     "Anesthesia services" as used herein shall mean anesthesiology and pain management services, including without limitation, all services and procedures performed on Hospital patients that are related to anesthesiology or pain management.  Anesthesia Services shall include such procedures and techniques regularly provided by other anesthesia providers within the Service Area, prescribed by recognized national professional medical organizations and protocols established by the Hospital.

Id. at 2.

Although Dr. Degani and Dr. Levinthal had different base salaries, the section on Compensation in both Agreements was identical in all other respects:

> 2.1:     For the services performed by Physician, hereunder, Hospital shall pay Physician, a base salary of Three Hundred Dollars ($300,000.00) per

6

> Contract year in equal installments pursuant to the normal Hospital payroll and an annual bonus equal to fifty (50%) percent of revenues collected by Hospital in any Contract year during the term hereof relating to the Anesthesia services provided by Physician hereunder which are in excess of Physician's base salary in that Contract year. Such bonus shall be paid by Hospital to Physician on the last day of the first month following the end of the Contract year in which the revenues relating to the Physician's Anesthesia services upon which the bonus is calculated were collected. "Contract year" as that term is used herein shall mean the twelve (12) month period commencing with the Effective Date of this Agreement and each anniversary of the Effective Date thereafter.

*Id*. at 4. During the hearing on the Preliminary Injunction, Dr. Degani testified that paragraph 2.1 does not contain any reference to the inclusion of Certified Registered Nurse Anesthetists ("CRNA").

Also contained within the Agreement is paragraph 11, entitled "Applicable Law," which provides that the Agreement "shall be subject to and governed by the laws of the State of Indiana."[3]

During the term of the Agreements, Dr. Degani approached Dr. Richard Berkowitz, the Medical Director of the Anesthesiology Department and the Doctors' supervisor, and inquired whether the Doctors would be paid the compensation designated as a "bonus" in their respective employment contracts. In 2003, Dr. Berkowitz obtained from the Hospital's billing company the amount of collections (charges and payments) for the Doctors' services and tendered these figures to the Doctors in a letter dated October 15, 2003. These figures included amounts collected for work performed by CRNAs under the medical direction or supervision of the Doctors.

The Hospital billed patients and collected revenues for services that the Doctors directly performed alone, and the Hospital billed patients and collected revenues for supervisory services that the Doctors performed in conjunction with a CRNA. For the supervisory work performed in

---

[3] All parties agree that Indiana law should be applied in determining the substantive outcome of this case.

conjunction with a CRNA, the Hospital billed patients in one of two ways–bundled or unbundled. The "bundled bills" contain just one charge for the entire anesthesia procedure whereas the "unbundled bills" contain a charge for the Doctor's work in supervising or directing the CRNA and a separate charge for the work of the CRNA.

On September 9, 2004, counsel for the Hospital tendered "bonus" checks in the amount of $13,305.35 and $13,333.41 to Drs. Degani and Levinthal respectively.[4]  The cover letter explained that the bonus checks were calculated as follows:

> (1) 100% billing credit has been given to the [Doctors] for all supervision of CRNAs;
> (2) 100% billing credit for all work that was directly performed by [the Doctors]; and
> (3) for bundled claims (those claims that include one charge bundling your clients' supervision fee and the CRNA fee) were credited to [the Doctors] at a value of 50% of the total bundled charge. This is the methodology used by third-party payors requiring the submission of a bundled claim. This method provides [the Doctors] with a 100% billing credit for their supervision.
>
> These sums were then added together, the salary subtracted from that sum and then 50% of that sum was taken which reflects the bonus payment.

Def. Mot., Exh. 6, p. 2.  In other words, for the purposes of calculating the tendered "bonus" compensation, for the work performed in conjunction with the CRNAs, the payment credited the Doctors only for the collections for work supervising or directing the CRNA but did not credit the collections for work performed by the CRNAs under the medical direction of the Doctors.[5]  If the Doctors had been credited for the work done by the CRNAs under the Doctors' medical direction,

---

[4] The Hospital provided these bonus checks because it had been put on notice by the Doctors by way of a letter dated August 12, 2004, that the Doctors were claiming a breach of contract for failure to pay the bonuses and that the Hospital had thirty days to cure the alleged breach.

[5] For the bundled bills, the "bonus" payment credited the Doctors for 50% of the revenue relating to the procedures for which patients received bundled bills.

then the bonus calculations would have been higher.  Prior to these checks, the Doctors had not received any compensation under the "bonus" provision of the Agreement.  The Doctors acknowledged receipt of the checks but issued a subsequent letter alleging that the calculations could be wrong.

Dr. Berkowitz testified at the Preliminary Injunction Hearing that he never thought the value of the bills or charges for the CRNA time should be included in the bonus calculation.  The Hospital's Chief Financial Officer testified at the Preliminary Injunction Hearing that the CRNA time was not included in the Doctors' bonus calculations as the bonus calculation formula at paragraph 2.1 does not provide for the inclusion of CRNA time.

## ANALYSIS

These cross motions for summary judgment are before the Court on two issues:  (1) whether the "annual bonus" calculation set forth in paragraph 2.1 of the Agreements between the Doctors and the Hospital provides for the inclusion of the value of the collections for CRNA services within a contract year; and (2) whether the "annual bonus" in paragraph 2.1 of the Agreements is a wage as defined under the Indiana Wage Payment Statute.

In their Partial Motion for Summary Judgment, the Doctors argue that the "annual bonus" set forth in paragraph 2.1 provides for the inclusion of the collections for CRNA services performed within the contract year and that the "annual bonus" is a wage as defined under the Indiana Wage Payment Statute.  On the same issues, the Hospital argues in its Motion for Summary Judgment that the "annual bonus" set forth in paragraph 2.1 does not provide for the inclusion of collections for

9

CRNA services and that the "annual bonus" is not a wage as defined under the Indiana Wage Payment Statute. The Court will address each issue in turn.

### A. The Calculation of the "Annual Bonus" Does Not
### Include the Certified Registered Nurse Anesthetist's Services

In their motion, the Doctors contend that the "annual bonus" set forth in paragraph 2.1 provides for the inclusion, not only of the collections for anesthesia personally provided by them and for their supervision of the CRNAs, but also for the services performed by the CRNAs themselves because the language of paragraph 2.1 includes the term "relating to" which should be construed broadly. In its own motion, the Hospital argues that the "annual bonus" language set forth in paragraph 2.1 does not provide for the inclusion of CRNA services performed because the plain meaning of the Agreement is that only the services "performed by" or "provided by Physician" are to be included in the calculation.

In contract construction under Indiana law, the Court's primary purpose is "to ascertain and give effect to the parties' mutual intent" at the time they wrote the agreement. *Ecorp, Inc. v. Rooksby*, 746 N.E.2d 128, 131 (Ind. Ct. App. 2001) (citing *Hutchinson, Shockey, Erley & Co. v. Evansville-Vanderburgh County Bldg. Auth.*, 644 N.E.2d 1228, 1231 (Ind. 1994); *Kelly v. Smith*, 611 N.E.2d 118, 121 (Ind. 1993)). Provided no ambiguity exists, the terms of the contract are given their plain and ordinary meaning. *Id*. (citing *George Uzelac & Assocs., Inc. v. Guzik*, 663 N.E.2d 238, 240 (Ind. Ct. App. 1996)). When a contract is ambiguous solely because of the language used within, the Court decides its construction as a matter of law. *Id*. (citing *Fresh Cut, Inc. v. Fazli*, 650 N.E.2d 1126, 1133 (Ind. 1995)). However, the Court "presume[s] that all provisions were included for a purpose" and "harmonizes all the various parts so that no provision is deemed to conflict with

. . . any other provision," *Magee v. Garry-Magee*, 833 N.E.2d 1083, 1092 (Ind. Ct. App. 2005) (citing *George S. May Int'l Co. v. King*, 629 N.E.2d 257, 261 (Ind. Ct. App. 1994)), and so as not to render any part meaningless, *see Encorp*, 746 N.E.2d at 131 (citing *Guzik*, 663 N.E.2d at 240; *King*, 629 N.E.2d at 261). The Court does not ignore clear language contained within an agreement. *See Indiana Gaming Co., L.P. v. Blevins*, 724 N.E.2d 274, 278 (Ind. Ct. App. 2000); *Wright Motors, Inc. v. Marathon Oil Co.*, 631 N.E.2d 923, 926-27 (Ind. Ct. App. 1994).

Adhering to this plain meaning rule, the Court will not read terms into a contract that do not exist so as to alter the terms of a contract. *Kiltz v. Kiltz*, 708 N.E.2d 600, 604 (Ind. Ct. App. 1999); *W. Ohio Pizza, Inc. v. Clark Oil & Refining Corp.*, 704 N.E.2d 1086, 1091 (Ind. Ct. App. 1999), *trans. denied*. Inasmuch as the court will not read terms into a contract that do not exist, it also will not ignore the terms that do exist. *See Modern Photo Offset Supply v. Woodfield Group*, 663 N.E.2d 547, 550 (Ind. Ct. App. 1996), *trans. denied*; *Marathon*, 631 N.E.2d at 926-27. Moreover, the meaning of a contract is to be determined from an examination of all of its provisions, not from a consideration of individual words, phrases, or even paragraphs read in isolation. *See Dick Corp. v. Geiger, Calanog, & Lucas*, 783 N.E.2d 368, 374 (Ind. Ct. App. 2003), *trans. denied*.

An ambiguity exists only where "reasonable people could come to different conclusions about the contract's meaning." *Ecorp, Inc.*, 746 N.E.2d at 131 (citing *Ruff v. Charter Behavioral Health Sys. of Northwest Indiana, Inc.*, 699 N.E.2d 1171, 1176 (Ind. Ct. App. 1998)). In determining the intention of the parties, the Court only looks within the "four corners" of the contract; however, if an ambiguity exists, the Court can then consider extrinsic evidence. *Ruff*, 699 N.E.2d at 1176 (citing *McCae Mgmt. Corp. v. Merchants Nat'l Bank & Trust Co. of Indianapolis*, 553 N.E.2d 884, 887 (Ind. Ct. App. 1990), *Rieth-Riley Constr. Co. v. Auto-Owners Mut. Ins. Co.*,

11

408 N.E.2d 640, 645 (Ind. Ct. App. 1980)); *see also In re Boelson Trust*, 830 N.E.2d 37, 43 (Ind.

Ct. App. 2005) (citing *East v. Estate of East*, 785 N.E.2d 597, 601 (Ind. Ct. App. 2003) (determining

that "[i]f an instrument is worded so that it can be definitely interpreted and its terms carried out by

applying that language to the subject matter thereof without contradiction, then the instrument is

unambiguous, and extrinsic evidence is inadmissible").  However, a contract is not ambiguous

simply because it could have been written more clearly.  *Baxter v I.S.T.A. Ins. Trust*, 749 N.E.2d 47,

52 (Ind. Ct. App. 2001).  Nor are the terms of a contract considered ambiguous simply because the

parties dispute their interpretations.  *Ecorp*, 746 N.E.2d at 131.

In this case, paragraph 2.1 of the Agreement is clear and unambiguous such that the intent

of the parties at the time the Agreement was signed is clear and the Court need not consider extrinsic

evidence.  The Court construes the Agreement according to its plain and ordinary meaning, and in

so doing, the Court will not include nonexistent terms and also will not exclude existing terms.

When a limiting phrase exists, the Court does not ignore that phrase but will give it its clear

meaning.  In this case, the first seven words of paragraph 2.1 constitute a limiting phrase that

modified the entire first sentence:

> *For the services performed by Physician hereunder*, Hosptial shall pay Physician a
> base salary of Three Hundred Thousand Dollars ($300,000) per Contract year in
> equal installments pursuant to the normal Hospital payroll *and* an annual bonus equal
> to fifty (50%) percent of revenues collected by Hospital in any Contract year during
> the term hereof *relating to the Anesthesia services provided by Physician* hereunder
> which are in excess of Physician's base salary in that Contract year.

Def. Mot., Exh. 1, p. 4 (emphasis added).  The limiting phrase "[f]or the services performed by

Physician hereunder" modifies both the annual salary of $300,000 and the "annual bonus."  In

addition, a second limiting phrase, found within the clause describing the "annual bonus" must also

be given its clear meaning: "relating to the Anesthesia services provided by Physician."  There is

12

no reference in this paragraph to services performed by CRNAs.  The Court finds that a plain reading of the first sentence of paragraph 2.1, with both limiting phrases, demonstrates that the bonus is to be calculated based on only the services provided by the Doctors and does not include services provided by any other individuals involved in the process of administering anesthesia, including the CRNAs.

Notably, the Doctors do not address this limiting language in their motion, but rather focus exclusively on the phrase "*relating to* the Anesthesia services provided by Physician," placing the emphasis on "relating to."  Although the Doctors cite accurate law regarding the meaning and interpretation of the term "relating to" as found in contracts as being a broad term, the Doctors' failure to address the more specific limiting language of the contract at issue in this case renders their argument unpersuasive.  For example, the Doctors' supervisory work "relat[es] to" anesthesiology, even though the Doctor is not performing any services directly on the patient.  Section 1.2, which defines "anesthesia services," and, as discussed further below, does not reference CRNAs.  As the Hospital points out, by giving the phrase "anesthesia services" such a broad interpretation, no party would reasonably know when to stop.  Such an interpretation would require the inclusion of the services performed in prepping the patient for surgery, the delivery of the supplies and pharmaceuticals for the anesthetics, or sanitizing the medical instruments.  Yet the Doctors do not ask for the inclusion of these other services–only the CRNA services.  Such a broad interpretation has no limits, and based on the plain meaning of the words used in the Agreement, the Court is not willing to imply this interpretation.  The more logical reading of the phrase "relating to" within the plain meaning of the sentence is those revenues collected "for" the services performed by the Doctors.

Moreover, there is no reference to the inclusion of "services provided CRNAs" or of CRNAs or nurses in any capacity within the language of the Compensation section of the Agreement. As no language is to be read into the contract that does not exist, the Court will not read in language that would require the inclusion of revenues collected for "services provided by CRNAs" in the calculation of the "annual bonus." The services performed by the Doctors include both those services performed directly on the patients by the Doctors as well as the supervision of CRNAs performed by the Doctors. *See* Def. Mot., Exh. 1 & 2, Exh. 1.1(A) (Agreement). Therefore, the Doctors are being credited for the services they themselves perform when working in conjunction with the CRNA. Services "provided by the CRNAs" cannot also be "provided" by the Doctors when the Doctors have a distinct supervisory role, albeit "in conjunction" with the services of the CRNAs.

When possible, all contract provisions should be harmonized so as to not render any part meaningless. In this case, the Doctors reference the definition of "Anesthesia services" found within paragraph 1.2 of the Agreement, which are defined as "anesthesiology and pain management services, including without limitation, all services and procedures performed on Hospital patients that are related to anesthesiology or pain management. Anesthesia Services shall include such procedures and techniques regularly provided by other anesthesia providers within the Service Area, prescribed by recognized national professional medical organizations and protocols established by the Hospital." *Id*. at 2. The Doctors conclude that the bonus calculation should include "all services and procedures performed on Hospital patients," without limitation, "relating to" anesthesiology, including the anesthesiology services performed on Hospital patients by CRNAs.

Yet, this interpretation would render null paragraph 1.1 and Exhibit 1.1(A). The language of paragraph 1.1 is clear that the "Anesthesia services," as defined in paragraph 1.2, to be provided

14

by the Doctors are specified in Exhibit 1.1(A), which outlines all of the specific services the Doctor is to perform, i.e. the administration of anesthesia and the supervision of the CRNAs.  Therefore, the logical reconciliation of paragraph 1.2 and paragraph 2.1, is that "Anesthesia services" as defined in paragraph 1.2 is a general definition of the term for use throughout the Agreement, that is later narrowed in Exhibit 1.1(A) for the purposes of defining "Anesthesia services" provided by the Doctors.  Nothing in any of these paragraphs or exhibits provides or even suggests that the specifically defined "Anesthesia services" to be "performed by" or "provided by" the Doctors also includes the "anesthesia services" provided by CRNAs.  Rather, any service that relates to the provision of anesthesia or pain services to Hospital patients and is provided by the physician is eligible for inclusion in the "annual bonus" calculation.

Furthermore, all sections of the Agreement that speak to the services provided by the Doctor consistently refer to the services performed by the Doctor as separate from those performed by other Hospital employees, such as CRNAs.  For example, in paragraph 1.15, the contract provides that the "Hospital shall be responsible for employment, termination, and reemployment of Hospital's employees providing services *in conjunction* with the services provided by Physician hereunder" (emphasis added).  Def. Mot, Exh. 1 & 2, p. 3.  Later, section 3.1 provides that the "Hospital shall provide . . .  personnel . . . to be necessary to allow Physician to fulfill his or her obligations under this Agreement," *Id*. at 4, which includes CRNAs who aid the Doctors in performing their duties as delineated in Exhibit 1.1(A) to the Agreement.  Based on these sections, as well as other references within the Agreement, the Court finds that no language within any term of the Agreement describing the Doctors' duties contemplates duties of the CRNAs as services provided by the Doctors.

An ambiguity exists only where reasonable people could come to different conclusions about the contract's meaning, and the Court does not assume an ambiguity exists solely because the parties dispute the terms of the contract or because it could have been written more clearly.  The terms used in paragraph 2.1 are common, everyday words, which should be given their common meaning, which is made even more clear by a reading of the entire the paragraph, including the identified limiting language.  Unlike *Encorp*, in which an undefined trade-specific term was used within the contract, a term whose definition was not commonly known by reasonable people, the language and terminology of the Agreement is easily understood.  Also, an ambiguity does not exist simply because the contract could have been written more clearly.  Although the Hospital could have more specifically enumerated what is not included in the bonus by providing a list of services not performed or provided by the Doctors, such a list is unnecessary in light of the limiting language.  Perhaps the Hospital also could have used a phrase other than "relating to" to explain the relationship between the collection of revenues and the services performed or provided by the Doctors.  Again, however, because the sentence begins with the limiting language, "For services performed by Physician," the Court gives the paragraph and the Agreement as a whole its plain meaning.

Based on the language of paragraph 2.1, which contains no references to CRNAs, as well as the Doctors' job description in Appendix 1.1(A), which only references CRNAs in that the Doctors are to supervise them, and the definition of "Anesthesia services" in paragraph 1.2, the Agreement and paragraph 2.1 are not ambiguous.  The plain meaning of paragraph 2.1 is that the calculation of revenues collected "relating to services provided by" the Doctors for the purpose of

calculating the "annual bonus," does not include revenues collected for the services provided by CRNAs.

### B.  The "Annual Bonus" is Not a Wage Under the Indiana Wage Payment Statute

In this case, each of the Doctors entered into an Agreement with the Hospital, which contained paragraph 2.1:

> For the services performed by Physician, hereunder, Hospital shall pay Physician, a base salary of Three Hundred Dollars ($300,000.00) per Contract year in equal installments pursuant to the normal Hospital payroll and an *annual bonus equal to fifty (50%) percent of revenues collected by Hospital in any Contract year during the term hereof relating to the Anesthesia services provided by Physician hereunder which are in excess of Physician's base salary in that Contract year.  Such bonus shall be paid by Hospital to Physician on the last day of the first month following the end of the Contract year in which the revenues relating to the Physician's Anesthesia services upon which the bonus is calculated were collected*. . . . .

Def. Mot., Exh.1 & 2, p. 4 (emphasis added).

In their motion, the Doctors argue that this "annual bonus" is a wage under the Indiana Wage Payment Statute because it is paid on a regular, periodic basis, is not linked to the overall financial success of the Hospital, and is tied directly to the work performed by the individual Doctors and because it is irrelevant that it is termed a "bonus" and is only paid annually.  In contrast, the Hospital contends that the "annual bonus" is not a wage under the Indiana Wage Payment Statute because the bonus is not directly linked to the amount of time that the Doctors worked, is contingent upon the financial success of the Hospital with respect to such variables as its ability to draw surgeons to schedule cases, generate pain management business, and successfully collect revenues from various payors, and is calculated on an annual basis.

17

Under the Indiana Wage Payment Statute, "[e]very . . . corporation . . . , doing business in Indiana, shall pay each employee at least semimonthly or biweekly, if requested, the amount due the employee. . . .   Any contract in violation of this subsection is void."  Ind. Code § 22-2-5-1(a). "Payment shall be made for all wages earned to a date not more than ten (10) days prior to the date of payment.  However, this subsection does not prevent payments being made at shorter intervals than specified in this subsection . . . ."  *Id*. § 22-2-5-1(b).  Most important to the claims of the Doctors,

> Every such . . . corporation who shall fail to make payment of wages to any such employee as provided in section 1 of this chapter shall, as liquidated damages for such failure, pay to such employee for each day that the amount due to him remains unpaid ten percent (10%) of the amount due to him in addition thereto, not exceeding double the amount of wages due, and said damages may be recovered in any court having jurisdiction of a suit to recover the amount due to such employee, and in any suit so brought to recover said wages or the liquidated damages for nonpayment thereof, or both, the court shall tax and assess as costs in said case a reasonable fee for the plaintiff's attorney or attorneys.

*Id*. § 22-2-5-2.  The term "wage" is defined as "all amounts at which the labor or service rendered is recompensed, whether the amount is fixed or ascertained on a time, task, piece, or commission basis, or in any other method of calculating such amount."  Ind. Code § 22-2-9-1.  "Wages are something akin to the wages paid on a regular, periodic basis for regular work done by the employee . . . ."  *Wank v. Saint Francis College*, 740 N.E.2d 908, 912 (Ind. Ct. App. 2000) (internal quotation marks omitted) (quoting *Wilson v. Montgomery Ward & Co.*, 610 F. Supp. 1035, 1038 (N.D. Ind. 1985)).

The term "bonus" applied to the method of compensation in an employment contract is not dispositive, and the Court must look to the "substance of the compensation to determine whether it is a wage."  *Gress v. Fabcon, Inc.*, 826 N.E.2d 1, 3 (Ind. Ct. App. 2005) (citing *Gurnik v. Lee*, 587

18

N.E.2d 706, 709 (Ind. Ct. App. 1992)); *Wank*, 740 N.E.2d at 909.  The Indiana Supreme Court has held that, generally, a bonus is a wage under the statute if the bonus directly relates to the time that an employee works, is paid with regularity, and is not dictated by the employer's financial success. *See Highhouse v. Orthopedic Inst. P.C.*, 807 N.E.2d 737, 739-40 (Ind. 2004); *see also Schwartz v. Gary Cmty. Sch. Corp.*, 762 N.E.2d 192, 198 (Ind. Ct. App. 2002) (deciding that an employee's unused sick leave was a wage because it was earned during the course of his employment and based on how long he was employed); *Pyle v. National Wine and Spirits Corp.*, 637 N.E.2d 1298, 1299 (Ind. Ct. App. 1994) (holding that a bonus is a wage "if it is compensation for time worked and is not linked to a contingency such as the financial success of the company").  When compensation is based on the expenses of the overall operation or on the profits of the company, it is not a wage.  *See Highhouse*, 807 N.E.2d at 740; *Gress*, 826 N.E.2d at 4 (holding that, because a salesperson could earn no commission if the project was not profitable and because the equation hinged on the past month's closings and costs, the compensation was not a wage); *Pyle,* 637 N.E.2d at 1300 (holding that the company's discretionary bonuses were not wages because they were based on the financial success of the company and were "not linked to the amount of work done by the employee"); *Jeurissen v. Amisub, Inc.*, 554 N.E.2d 12, 12 (Ind. Ct. App. 1990) (holding that a hospital's incentive plan to compensate its full-time employees was geared to the financial success of the hospital and therefore was not a wage).  However, if the annual compensation is not contingent on the company being profitable, but rather is a percentage of the "net profits" and is based on the time the employee worked, evidenced by the fact that the compensation would be pro rated if the employee left before the end of the year, the compensation is a wage. *Gurnik*, 587 N.E.2d at 707, 709-10.

Paragraph 2.1 of the Agreement between the Doctors and the Hospital specifically provides that the bonus calculation is to be based on the collection of revenue for the services "performed" or "provided by Physician."   Unlike the agreements in *Highhouse*, *Jeurissen*, and *Pyle*, the Agreement did not factor in the overall financial success of the Hospital in the Doctor's bonus compensation.   Also, unlike the agreement in *Gress*, which only provided for the payment of commission if the jobs sold by the plaintiff were profitable, the Doctors in this case would receive the fifty percent of revenue collected in excess of the $300,000 salary regardless of whether the Doctors' services were profitable or whether the anesthesia department itself was profitable.  To that extent, the bonus was not contingent on the financial success of the Hospital or the department.

Nevertheless, the Doctors only receive bonus compensation if the Hospital is successful in collecting the accounts receivable for the anesthesia services provided by the Doctors, a factor outside the control of the Doctors.  For those accounts collected upon by the Hospital, the work actually performed by the Doctors is taken into account; however, those services provided by the Doctors for which no revenue is ultimately collected by the Hospital or for which a reduced revenue is collected, the amount collected is not directly linked to the value of the actual services performed by the Doctors.  Moreover, the Doctors do not receive any bonus unless the revenues collected exceed the Doctors' annual salary of $300,000, at which point the Doctors would begin to collect fifty percent of the revenue in excess of the $300,000.  Put another way, the Doctors are not guaranteed any bonus, even if the Doctor works a full schedule throughout the year, if the revenue collected for the Doctor's services never exceeds $300,000, either due to the number of services performed by the Doctor at the Hospital or because of the Hospital's inability to collect payment on its accounts.  Also, there is no provision in the Agreement that the bonus would be paid pro rata if

20

the Doctor's employment terminated prior to the end of the year.  *See Gurnik*, 587 N.E.2d at 709.

Nor can it be said that the bonus is "tied to regular work done on a periodic basis" by the Doctors.

*See id*.  Thus, as in *Highhouse*, although it is clear that the Doctors' efforts contributed to the

calculation of their bonuses, their services rendered were not the sole factor in the calculation.  *See*

807 N.E.2d at 740.  Accordingly, the bonus is not a wage.

As a practical matter under the statute, the Court also takes into account the timing of the

agreed compensation.  The Indiana Wage Payment Statute contains a provision that all wages must

be paid within ten days of being earned or the penalty will be imposed.  *See* Ind. Code § 22-2-5-1(b);

*Highhouse*, 807 N.E.2d at 740.  Therefore, a wage that is paid annually tends to show that the

payment is a bonus, rather than a wage.  *See Highhouse*, 807 N.E.2d at 740.  However, the fact that

the payments are made annually does not necessarily mandate that the compensation is a bonus.  *See*

*Gurnik*, 587 N.E.2d at 709.

In *Gress*, in which the court held that the compensation was not a wage, the plaintiff's

monthly commission was based on factors such as whether the costs for the job sold by the plaintiff

had been paid, whether the job had been "closed out," and whether any determination had been

made as to profitability, which could not be determined within ten days, rather than based on the

work actually performed by the plaintiff in the previous month.  826 N.E.2d at 4.  Similarly, in

*Highhouse*, the court held that, practically, the compensation was not a wage because the plaintiff's

bonus was based on collections for his services, rather than billings, which might require

substantially more than ten days after the services were performed before the bonus could be

calculated.  807 N.E.2d at 740.  In contrast, in *Gurnik*, the employee's agreement provided for an

annual salary, as well as an annual bonus; the court held that because the annual bonus paid was

21

"similar to the annual draw settlement feature of the commissions . . .  and is not inconsistent with the deferred compensation features of vacation pay" it is a wage.  587 N.E.2d at 709-10; *see also Schwartz*, 762 N.E.2d at 198 (holding that sick leave earned over the course of the plaintiff's employment but not paid until he left was a wage because had he chosen to utilize the days during his tenure,  he "would have received their benefit as part of his regular wages"); *Die & Mold, Inc. v. Western*, 448 N.E.2d 44, 47-48 (Ind. Ct. App. 1983) (holding  that vacation pay that was not paid until the employee left the job was still a wage because it was "earned weekly, where only the time of payment [was] deferred").

In this case, like in *Highhouse*, the Doctors' bonuses were based on collections, not billings. Each Doctor's bonus could only be paid once the revenues collected by the Hospital for each Doctor's work exceeded $300,000, at which point the Doctor would receive half of the excess.  For all the work performed by the Doctor in the months leading up to the time when the collections reached $300,000 many more than 10 days would have passed, thus automatically precluding compliance with the statutory requirement that the wage be paid within ten days of being earned. Even for the work performed by the Doctor within the annual period after the collections reached $300,000, it is unlikely that the Hospital would be able to issue bills and pursue collection of all the amounts due in order to calculate the bonus within ten days of the work performed by the Doctor. Therefore, because of the time required to collect the revenue based on the work performed by the Doctors and thus to calculate the bonus compensation, it was impossible for the Hospital to know

22

what bonus amount was due to the Doctor within ten days of the performance of the anesthesia services by the Doctor.  Accordingly, on this basis as well, the "annual bonus" is not a wage.[6]

**CONCLUSION**

Based on the foregoing, the Court hereby **GRANTS** the Defendant Community Hospital's Motion for Summary Judgment [DE 65] and **DENIES** the Plaintiffs' Motion for Partial Summary Judgment [DE 63].  The Court **REAFFIRMS** the Discovery Deadline of **December 9, 2005**, the Final Pretrial Conference of **December 22, 2005**, and the Jury Trial Date of **January 9, 2006.**

SO ORDERED this 12th day of October, 2005.

 s/ Paul R. Cherry
MAGISTRATE JUDGE PAUL R. CHERRY
UNITED STATES DISTRICT COURT

cc:    All counsel of record

---

[6] In making its determination, the Court may also look to when the employee first became aware of the compensation.  If the payment was bargained for at the time of hiring, then it is more likely to be considered a wage. *Wank*, 740 N.E.2d at 909.  However, if the payment was offered after employment, such as an extra incentive that the employee did not know about, it is a bonus.  *Pyle*, 637 N.E.2d at 1299.  For example, in *Pyle,* the company offered an annual bonus, but each year the president sent a letter stating that "there is no guarantee that bonuses will become an annual event." 637 N.E.2d at 1299.  Partially because the compensation was not a basis of any employee's compensation package, it was deemed a bonus.  *Id*. at 1300.  Also, in *Wank*, the defendant did not originally offer its employees a severance package when they were hired.  740 N.E.2d at 909.  Subsequently, a merger occurred, which led the defendant to offer a severance package to the terminated employees.  *Id*.  The court held that although the employee could have negotiated for severance pay when he was hired, he did not and he accepted the position without the benefit of a contracted severance package; therefore, the defendant was not obligated to pay and the optional offer it gave its terminated employees after the merger did not turn into a "vested right to a wage." *Id*. at 914.  In contrast, in *Schwartz*, the Court decided that sick leave is a wage when termination requirements are provided in the company's policy.  762 N.E.2d at 199 n.2.  In the present case, the Doctors were aware of the annual bonus at the time they signed the Agreement, which would favor a determination that the compensation is a wage.  However, this factor is not dispositive and does not change the Court's finding that, based on other factors set forth above, the compensation is not a wage.